LINCOLN CHEMICAL CORPORATION )
and EDWARD DOLE, )
                      )
            Plaintiffs )
                      )
        vs. )     CAUSE NO. 3:12-CV-303 RLM-CAN
                      )
DUBOIS CHEMICALS, INC., )
                      )
          Defendant )
                      )
      and )
                      )
GALAXY ASSOCIATES, INC., )
                      )
   Defendant/Counterclaimant )

## OPINION AND ORDER

An evidentiary hearing was held on October 22, 2102 on the motion of Galaxy Associates, Inc. for a preliminary injunction against Lincoln Chemical Corporation and Edward Dole to enforce a covenant not to compete that Galaxy says it had with Mr. Dole, who quit his employment with Galaxy and went to work for Lincoln. For the reasons that follow, the court finds that the injunction should be issued.

## I. Facts

Edward Dole is a sales representative in the specialty chemical industry. The employment agreement that Mr. Dole signed with Fremont Industries in November 1998 contained a non-compete provision that prohibited him, for a period of eighteen months, from selling competing products to customers to whom he sold while working for "the Company." The employment agreement contained a provision that it was to be governed by Minnesota law. Mr. Dole had access to a wide range of confidential information, including customers lists, data concerning customers' purchasing needs, and pricing information.

In April 2004, Fremont Acquisitions acquired some of Fremont Industries' assets. The purchase agreement was contingent upon the seller delivering at least 75 percent of the sales dollars represented by Fremont Industries sales representatives. In furtherance of that obligation, Fremont Industries sent all of its sales representatives to Minneapolis to meet with Fremont Acquisitions management. The representatives met as a group and individually with a representative from the old and the new Fremont entities.

When Mr. Dole had his individual meeting, he was presented with a paper called an "Acknowledgment," saying that he understood that his non-compete provision would apply to his employment with Fremont Acquisitions. Mr. Dole asked if he could have someone look at the Acknowledgment and was told that it had to be taken care of that day (the purchase date was only a day or two away).

Mr. Dole wasn't told that he could discuss the Acknowledgment with an attorney or that his employment with Fremont Acquisitions wasn't contingent upon his signing it. Mr. Dole signed the paper. John Capone, another Fremont Industries sales representative, declined to sign and continued working as a sales representative after the Fremont Acquisitions purchase.

Galaxy Associates merged with Fremont Acquisitions in 2005; the resulting company was called Galaxy Associates, Inc.

Mr. Dole worked as a sales representative for Fremont Acquisitions and then Galaxy from 2004 to 2012, servicing accounts in Nebraska. In 2011, Lincoln Chemicals, a competitor of Galaxy, began trying to hire experienced sales representatives in the specialty chemicals field. John Capone was one of those that Lincoln hired; when Mr. Capone began selling to his former Fremont Acquisitions accounts, Galaxy sued him for breaching his non-compete clause.

DuBois Chemicals, Inc. acquired Galaxy in March 2012. Mr. Dole heard rumors that DuBois was going to require Galaxy employees to sign new non-compete agreements. Mr. Dole resigned instead, on April 30, 2012, without prior notice to either Galaxy or DuBois.

Galaxy hadn't provided Mr. Dole with a computer, so he kept a considerable amount of work-related material on his personal laptop. He retained that material on his laptop after leaving Galaxy. He says he did so because Galaxy didn't ask

for it back. He accessed that material after changing employers, occasionally at Lincoln's request.

The material on Mr. Dole's computer included: a document from a sales meeting containing information regarding Galaxy's sales, margins, accounts receivables, and cost of sales; a service schedule Mr. Dole used to organize his daily work; a company-wide list of Galaxy customers; a Metal Working Fluids Tool Box; a list of prospects, including potential sales opportunities, the stage of each opportunity, expected closing dates of the potential deals, potential annual sales to the identified prospects, and featured products (Galaxy had asked Mr. Dole to dispose of this document, which was marked "confidential"); a Galaxy prospect list as of April 13, 2012; another Galaxy prospect list for Mr. Dole's region; sales reporting notes for Mr. Dole's Galaxy accounts; commission information for Galaxy sales representatives, including customer names, products sold, and margins; an internal summary of all Galaxy products; a list of all Galaxy customers with the products each customer purchased, old and new pricing, and margins; a 2011 pricing analysis by customer for every Galaxy customer in Mr. Dole's region; a customer pricing list for Mr. Dole's Galaxy accounts; a budget worksheet showing how all sales employees in Mr. Dole's region were performing in sales versus budget; a summary of all Galaxy sales employees' commission rates from January through October 2011 (Mr. Dole wasn't supposed to get that summary, and his supervisor asked him to discard it).

## II. Preliminary Injunction Standard

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) (*quoting* 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d ed. 1995)). "The purpose of a preliminary injunction is to minimize the hardship to the parties pending resolution of their lawsuit." <u>Anderson v. U.S.F. Logistics (IMC), Inc.</u>, 274 F.3d 470, 474 (7th Cir. 2001). One seeking a preliminary injunction must demonstrate a reasonable likelihood of success on the merits of its claim, a lack of an adequate remedy at law, and that irreparable harm will result if the injunction isn't granted. <u>Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc.</u>, 549 F.3d 1079, 1086 (7th Cir. 2008); <u>Lambert v. Buss</u>, 498 F.3d 446, 451 (7th Cir. 2007). If that showing is made, the court must then consider any irreparable harm the preliminary injunction might impose upon the party against whom the injunction is sought and whether the preliminary injunction would harm or foster the public interest. <u>Lambert v. Buss</u>, 498 F.3d 446, 451 (7th Cir. 2007); <u>Christian Legal Society v. Walker</u>, 453 F.3d 853, 859 (7th Cir. 2006). "[T]he court then weighs all these factors employing a sliding-scale approach. That is, the more likely the plaintiff's chance of success on the merits, the less the balance of harms need weigh in its favor." <u>Promatek Indus., Ltd. v. Equitrac Corp.</u>, 300 F.3d 808, 811 (7th Cir. 2002).

The moving party's likelihood of success on the merits of the underlying claim is the threshold consideration in analyzing a preliminary injunction motion. Barbecue Marx, Inc. v. 551 Ogden, Inc., 235 F.3d 1041, 1043 (7th Cir. 2000); Platinum Home Mortg. v. Platinum Fin. Group, 149 F.3d 722, 726 (7th Cir. 1998). Galaxy has demonstrated a reasonable likelihood of success on its underlying claims against Mr. Dole and Lincoln.

## A. Likelihood of Success on the Merits

### 1. The Covenant Not to Compete

Galaxy contends Mr. Dole's 1998 employment agreement with Fremont Industries followed him from employer to employer until 2012. That agreement contains a choice-of-law clause providing that Minnesota law governs the agreement.

> A non-compete agreement entered into at the beginning of an employment agreement does not require independent consideration and, thus, is enforceable if the agreement is found to be reasonable. . . . 'The test of reasonableness [under Minnesota law] is whether or not the restraint is necessary for the protection of the business or goodwill of the employer and, if so, whether the stipulation has imposed upon the employee any greater restraint than is reasonably necessary to protect the employer's business, regard being had to the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends.'

Guidant Sales Corp. v. Niebur, No. Civ. 01-1772DWFAJB, 2001 WL 1636502, at *6 (D. Minn. Oct. 18, 2001) (*quoting* Prow v. Medtronic, Inc., 770 F.2d 117, 120 (8th Cir. 1985)).

Lincoln and Mr. Dole don't question the reasonableness of the covenant's scope (former Galaxy accounts) or duration (eighteen months). They contend Mr. Dole's employment agreement (and so his covenant not to compete) wasn't transferred to Fremont Acquisition. Thus, they explain, the Acknowledgment is the closest thing to an employment agreement between Mr. Dole and Fremont Acquisition, and the Acknowledgment and the circumstances surrounding its signing fall short of what Minnesota law requires for an employment contract. With respect to the counterclaim based on Galaxy's trade secrets/confidential secrets policy, Lincoln and Mr. Dole say no one from Galaxy asked him to return the documents and the documents aren't confidential in any event.

Minnesota law allows covenants not to compete to be transferred to a successor in interest.

> [I]n Minnesota . . . a finding of assignability [of a restrictive covenant] likely depends on the language of the contract. Moreover, Minnesota courts are historically reluctant to enforce covenants not to compete because such covenants decrease competition and restrict the employee's ability to earn a living. Therefore, where the contract does not provide for assignment, a Minnesota court . . . would likely construe the language of the contract against the employer and find any assignment void.

Inter-Tel, Inc. v. CA Communications, Inc., No. Civ. 02-1864PAMLE, 2003 WL 23119384, at *4 (D. Minn. Dec. 29, 2003) (*citing* Jim W. Miller Constr., Inc. v. Schaefer, 298 N.W.2d 455, 458 (Minn. 1980).

The strongest argument from Lincoln and Mr. Dole is that even if non-compete covenants are transferrable, the agreement between Fremont Industries and Fremont Acquisitions didn't transfer any such covenants: that agreement listed the items transferred, and employment agreements weren't among them. Lincoln and Mr. Dole cite Schedule 2.1 of the closing documents, which lists the purchased assets without reference to employment agreements or covenants not to compete. A brief sprint through the complex set of acquisition papers — about three inches thick and admitted at the hearing as Plaintiffs' Exhibit H — shows many references to the in-place sales force, sales employees, the seller's (Fremont Industries') contractual obligations to sales representatives, and the purchaser's (Fremont Acquisitions') obligations with respect to employment agreements.

At worst, the omission of employee agreements from Schedule 2.1 of the closing document creates an ambiguity on which parol evidence would be admissible (or so the court assumes; neither side cited Minnesota law on parol evidence or contract interpretation, so the court assumes Minnesota law is the same as Indiana's, *see* Kochert v. Adagen Medical Int'l, Inc., 491 F.3d 674, 677 (7th Cir. 2007) ("Neither party argues that the application of Georgia law (pursuant to the contract's choice-of-law provision) would alter the outcome of the

case. Where the parties have not identified a conflict in state law, we will generally apply the law of the forum state."). The purchase agreement, along with Mr. Oeters' hearing testimony that the sales force was part of the acquisition, indicate that Galaxy has a strong likelihood of prevailing on its contention that the 1988 covenant was conveyed to Fremont Acquisitions and so still binds Mr. Dole.

That finding sinks Lincoln's and Mr. Dole's other attacks on the Acknowledgment Mr. Dole signed in 2004. Lincoln and Mr. Dole argue that Mr. Dole was given an opportunity neither to consult counsel nor even to think before signing, and Mr. Dole was either incompletely informed or purposely misinformed about the Acknowledgment's nature. The Acknowledgment, though, has no impact on the transfer or enforceability of the non-compete covenant in the 1998 agreement. Fremont Industries had the right to transfer the 1998 agreement to Fremont Acquisitions, and it appears far more likely than not that Fremont Industries did so. Mr. Dole's consent, whether informed or not, wasn't needed; neither was the additional consideration ordinarily needed for a new contract required.

Lincoln and Mr. Dole argue that even if the purchase agreement included the sales representatives' employment agreements (and their non-compete covenants), Fremont Acquisitions didn't comply with Section 5.4(a) of the purchase agreement. That section, as Lincoln and Mr. Dole read it, required Fremont Acquisitions to affirmatively hire (make offers with specific benefits to)

the sales employees; required the sales representative to acknowledge that their employment agreements were assigned; and required that the offers include substantially similar or better terms. That paragraph isn't quite as clear to the court as Lincoln and Mr. Dole see it. The paragraph's second sentence speaks of current employees needing to acknowledge that they now work for Fremont Acquisitions (which wouldn't seem to entail offers for new employment), while the next two sentences raise the topic of job offers:

> . . . The Current Employees who are engaged in sales or sales management positions (the "Sales Employees") shall be required to sign an Acknowledgment that their Employment Agreement with Seller has been assigned to the Buyer (the "Sales Employee Acknowledgments"). The offers for employment shall include compensation on terms substantially similar to or more favorable than those in existence on the date hereof as well as substantially similar to or more favorable than those in existence on the date hereof as well as substantially similar job duties and responsibilities at their current locations and shall remain open through the Closing. The offers for employment will also include employee benefits and programs that, in the aggregate, are at least substantially similar to those currently provided by Seller.

Neither side has offered an explanation of the section's internal tension.

Lincoln and Mr. Dole argue that Section 5.4(a) (as they understand it) created a condition precedent to the transfer to Fremont Acquisitions of the sales force's employment agreements. Since no one from Fremont Acquisitions made an offer of employment to Mr. Dole, they say, his employment agreement (with the non-compete covenant) wasn't assigned to Fremont Acquisitions. Galaxy has a very strong likelihood of succeeding on this argument: the purchase agreement

was between Fremont Industries and Fremont Acquisitions. Mr. Dole was neither a party to, nor a third-party beneficiary of, the purchase agreement. Had Fremont Industries been dissatisfied with Fremont Acquisitions' performance under Section 5.4(a), Fremont Industries might have had a right to not close. But the closing — and the transfer of Mr. Dole's employment agreement — wasn't something that required Mr. Dole's satisfaction with Fremont Acquisitions' performance.

Galaxy has shown that it has a strong likelihood of success on its claim that Mr. Dole is breaching his covenant not to compete.


## 2. The Trade Secrets Misappropriation Claim

It appears to be undisputed that since leaving Galaxy, Mr. Dole has retained on his personal computer considerable proprietary information of Galaxy and customers that Mr. Dole serviced while he worked for Galaxy. Mr. Dole says he retained it simply because Galaxy never asked for its return or destruction. When he began working for Lincoln, Mr. Dole emailed Galaxy Material Safety Data Sheets to Lincoln at Lincoln's request. Galaxy considers such data sheets to be proprietary confidential information; Mr. Dole and Lincoln dispute that characterization.

To prevail on his claim of trade secrets violation in Count 5 of its counterclaim, Galaxy must show that Mr. Dole retained trade secrets when he left for Lincoln. "To qualify as a trade secret under Minn. Stat. § 325C.01, '(1) the

information must not be generally known nor readily ascertainable; (2) the information must derive independent economic value from secrecy; [and] (3) the plaintiff must make reasonable efforts to maintain secrecy.'" <u>Strategic Directions Group, Inc. v. Bristol-Myers Squibb Co.</u>, 293 F.3d 1062, 1064-1065 (8th Cir. 2002) (*quoting* <u>Widmark v. Northrup King Co.</u>, 530 N.W.2d 588, 592 (Minn. Ct. App. 1995)). "In a trade secret case, '[s]imply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status.'" <u>SL Montevideo Technology, Inc. v. Eaton Aerospace, LLC</u>, 491 F.3d 350, 354 (8th Cir. 2007) (*quoting* <u>Jostens, Inc. v. National Computer Sys.</u>, 318 N.W.2d 691, 699 (Minn. 1982)).

If Galaxy establishes that Mr. Dole has retained trade secrets, it must also show that Mr. Dole misappropriated them. "A defendant is liable for misappropriation of a trade secret if the defendant has acquired the trade secret through improper means. Minn. Stat. § 325C.01, subd. 3. In some instances, the secret is so unique that the emergence of a similar, slightly altered product gives rise to an inference of misappropriation." <u>Wyeth v. Natural Biologics, Inc.</u>, 395 F.3d 897, 900 (8th Cir. 2005).

Bill Oeters's testimony at the hearing demonstrates that most of the information Mr. Dole retained is neither generally known nor readily ascertainable and derives independent economic value from secrecy. Mr. Dole's original 1998

employment agreement with Fremont Industries amounts to a reasonable effort to maintain secrecy. Section 5 of the agreement provides (with Galaxy having become "Company" by the time of the alleged tort):

> 5. <u>Confidential Information</u>. Employee understands and agrees that the business of the Company is highly competitive and is based upon specialized work, and that as an Employee, Employee will receive or contribute to Confidential Information, which information is of substantial value and unique value to Company. The Employee agrees that at all times during the period of Employee's employment and after the termination for any reason whatsoever, Employee shall keep secret all such Confidential Information and that Employee will not use or make known the same to any person, firm, or corporation without first obtaining the written consent of the Company. . . . Employee understands that Employee is legally obligated to not disclose Confidential Information or in any way violate the terms of this Agreement.

Section 1b of the employment agreement defined "Confidential Information" this way:

> b. "CONFIDENTIAL INFORMATION" means trade secrets and other information proprietary in nature, to Company, not generally known, relating to Company's affairs, which includes but is not limited to such things as plans, production processes, financial data, product specification and formulas, marketing strategies and methods, production methods, technical and product bulletins, inventory schedules, sales figures, data on equipment and chemicals sold and equipment serviced, surveys, research and development programs, sales techniques, formulas, price lists, correspondence with suppliers and customers, customer lists or any other information obtained regarding customers, customer prospect cards, sales reports, financial information, technological developments, customer needs and buying practices, "know-how" relating to Company business and other confidential or proprietary information of Company.

When the list of retained items is added to the mix, Galaxy has convinced the court that a very substantial likelihood exists that it will be able to prove that Mr. Dole retained trade secrets.

Galaxy still must show that Mr. Dole misappropriated those trade secrets. Again, his 1998 employment agreement is very helpful to Galaxy. Section 5 of that agreement (which already was quoted in part above) also provides:

> 5. <u>Confidential Information</u>. . . . Upon termination of Emp1oyee's employment, or at any time Company may so require, the Employee shall turn over to the Company all notes, memoranda, notebooks, drawings or other records or documents made, compiled by or delivered to Employee, concerning any Confidential Information, including any copies in Employee's possession, it being agreed that the same and all information contained therein are at all times the property of the Company. . . .

Mr. Dole had a contractual obligation to turn over all confidential information (including trade secrets) to his employer when his employment ended. He did not do so. Mr. Dole misappropriated the information because he possesses it through improper means. <u>Wyeth v. Natural Biologics, Inc.</u>, 395 F.3d at 900. Whether the data sheets Mr. Dole provided to Lincoln are trade secrets — and Galaxy seems to have the better of that argument — Mr. Dole has used trade secrets to sell to his former Galaxy customers. Galaxy has shown a strong likelihood of success on the merits of its trade secrets claim.


<u>B. Irreparable Harm</u>

The next requisite factors for a preliminary injunction are a lack of adequate remedy at law and a showing that irreparable harm will result if the injunction isn't granted. <u>Lambert v. Buss</u>, 498 F.3d 446, 451 (7th Cir. 2007). "An injury is irreparable for purposes of granting preliminary injunctive relief only if it cannot be remedied through a monetary award after trial." <u>East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.</u>, 414 F.3d 700, 703 (7th Cir. 2005). Because "speculative injuries do not justify this extraordinary remedy," *id.* at 704, "a [movant] cannot obtain a preliminary injunction by speculating about hypothetical future injuries." *Id.* at 705-706; *see also* <u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires [movants] seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."). "To demonstrate irreparable injury, [Galaxy] must show that [it] will suffer harm that cannot be prevented or fully rectified by the final judgment after trial." <u>Anderson v. U.S.F. Logistics (IMC), Inc.</u>, 274 F.3d 470, 478 (7th Cir. 2001). "A [movant] may suffer irreparable harm if the nature of the loss makes monetary damages difficult to calculate." <u>East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.</u>, 414 F.3d at 705.

Those questions are easily answered. Only speculative damages would be available at the end of the litigation process for Mr. Dole's business dealings on Lincoln's behalf with his former Galaxy accounts; experts would be uncertain what business Galaxy would have gotten, but lost because Mr. Dole breached his

covenant not to compete. *See* <u>Hess Newmark Owens Wolf, Inc. v. Owens</u>, 415 F.3d 630, 632 (7th Cir. 2005) ("[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'"). Nor could damages be reasonably calculated for any misuse of trade secrets between now and the end of the litigation process. If not enjoined, Lincoln will continue to send Mr. Dole out to sell to his former Galaxy accounts. Because damages wouldn't be adequate or sufficient, a failure to grant injunctive relief would cause Galaxy irreparable harm.

## C. Balancing Harms

"The balance between the harm to the plaintiff if injunctive relief is denied and the harm to the defendant if it is granted is a critical consideration in deciding whether to grant a preliminary injunction." <u>Ayres v. City of Chicago</u>, 125 F.3d 1010, 1012 (7th Cir. 1997). "In balancing the harms, the court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose." <u>Foodcomm Int'l v. Barry</u>, 328 F.3d 300, 305 (7th Cir. 2003); *see also* <u>Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.</u>, 128 F.3d 1111, 1120-1121 (7th Cir. 1997) (in balancing the harms, "the irreparable harm the nonmovant will suffer if an injunction is granted is weighed against the irreparable damage the movant will suffer if it is not").

Mr. Dole and Lincoln argue that the harm an erroneous injunction would work on Mr. Dole more than counterbalances any irreparable harm threatening Galaxy. As to the harm to Galaxy, they point out that Galaxy proceeded unhurriedly to prevent the harms it cites: Galaxy didn't replace either Mr. Dole or his supervisor when they left for Lincoln; Galaxy's parent, DuBois Chemical, has three to four sales representatives in the Nebraska/Iowa territory; and Galaxy didn't seek quicker relief through a temporary restraining order. Mr. Dole, in contrast, has worked and lived with his family in the Nebraska/Iowa market since 1998. He believed that DuBois's acquisition of Galaxy threatened his livelihood because at least one of his clients told him it wouldn't do business with DuBois, and Mr. Dole would have to share his territory with three DuBois sales reps.

The court is hesitant, when weighing harms arising from an injunction decision, to penalize one side for not having rushed into court quickly enough. This record doesn't disclose when Galaxy learned that Mr. Dole was calling on forbidden customers; merely going to work for Lincoln didn't violate Mr. Dole's non-compete clause. This record doesn't disclose what efforts (if any) Galaxy might have undertaken to try to resolve the dispute before filing its injunction motion. The record doesn't disclose when Galaxy had assembled the information it deemed necessary to win injunctive relief. The record shows only that

(a) Mr. Dole first violated the non-compete provision by contacting a Galaxy account as a Lincoln representative on or around May 1, 2012;

(b) Galaxy moved for a preliminary injunction on June 22, seven weeks and four days later;

(c) Galaxy sought and obtained expedited discovery; and

(d) the parties jointly moved to continue the September 13 hearing because they hadn't been able to complete discovery, and the court rescheduled the hearing for October 22.

The court doesn't infer from that table of events that Galaxy's pace of litigation bespeaks minimal harm.

The court isn't persuaded that the harm Mr. Dole would suffer from an injunction later found to be entered in error counterbalances the risk of irreparable harm facing Galaxy. The requested injunction wouldn't prevent Mr. Dole from working and living in the area where he has worked and lived for the past fourteen years. It would simply prevent him from doing business with his Galaxy clients for a year and half. Even if some present or later-discovered defense entitles him to prevail, the harm to him would be no more than what he agreed to in 1998.

The balance of harms and hardships favors Galaxy and the issuance of the requested injunction.

## D. Public Interest

"The final factor to be considered in conjunction with a preliminary injunction is the public interest, which is the effect that granting or denying the injunction will have on nonparties." Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1121 (7th Cir. 1997); *see also* Platinum Home Mortg. v. Platinum Fin. Group, 149 F.3d 722, 726 (7th Cir. 1998) (party seeking preliminary injunction must demonstrate that "the preliminary injunction will not harm the public interest"). "[A] court is supposed on its own initiative to refuse to enter an injunction that disserves the public interest." American Family Mut. Ins. Co. v. Roth, 485 F.3d 930, 934 (7th Cir. 2007).

This dispute touches most lightly on the public interest. Who represents DuBois/Galaxy and/or Lincoln in dealings with a limited number of businesses in Nebraska and Iowa is important to those businesses and the parties before the court, but has little public resonance.


## E. Unclean Hands

Finally, Lincoln and Mr. Dole invoke the "unclean hands" doctrine: that he who seeks equity must do equity. Lincoln and Mr. Dole note a wide range of what they see as inequitable conduct by Galaxy and its principals. Most of that conduct deals with events that occurred several years before today's controversy arose. More pertinent to the events before the court today are that Galaxy principals

made misleading statements to Fremont Acquisition sales representatives in conjunction with the signing of the Acknowledgments; Galaxy principals didn't require all similarly situated employees to sign Acknowledgments; and Galaxy used a shorter non-compete term in its own contracts with sales representatives than those in the contracts acquired from Fremont Acquisitions. Lincoln and Mr. Dole assert other acts they see as inequitable, but the court finds from this record that those things didn't happen.

Today's unclean hands doctrine is not what it once was:

> Unclean hands is a traditional defense to an action for equitable relief. The purpose is to discourage unlawful activity, and is as relevant to preliminary as to final relief. It is true that a modern chancellor unlike his medieval forbears does not have uncabined discretion to punish moral shortcomings by withholding equitable relief. Modern equity is a system of entitlements. But equitable relief is costly to the judicial system, especially in a case such as this where the relief sought would cast the court in a continuing supervisory role. It would make no sense to incur that cost on behalf of someone who was trying to defraud the person against whom he was seeking the court's assistance. One who has defrauded his adversary to his injury in the subject matter of the action will not be heard to assert a right in equity.

The Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd., 970 F.2d 273, 281 (7th Cir. 1992) (internal citations omitted).

None of the things Lincoln and Mr. Dole point to amount to the sort of fraudulent or inequitable conduct that prevents injunctions. Whatever Galaxy's principals told its sales representatives about the Acknowledgments in 2004, and however many sales representatives signed an Acknowledgment in 2004, caused

no harm to Mr. Dole or Lincoln because the sales representatives' contracts (with the non-compete clauses) were transferred to Fremont Acquisitions regardless of the Acknowledgments. Lincoln and Mr. Dole cite no authority for the proposition that an employer can't have differing terms in non-compete clauses depending on the genesis of the employment agreement.

Actually, were some inequity or fraud discerned in the conduct to which Lincoln and Mr. Dole point, the inequity of Lincoln's own conduct would dwarf it. According to the record before the court — and it must be remembered that evidence presented later could change the way things look — Lincoln is building a sales force by poaching competitors' sales reps, then sending the poached reps out to poach customers they worked with before coming to Lincoln, in willful blindness to any covenants not to compete.

The doctrine of unclean hands doesn't weigh against, or justify denying, the requested injunction.


F. Bond

Before an injunction can become effective, a bond must be fixed and posted. FED. R. CIV. P. 65(b). The parties didn't address the appropriate bond at the preliminary injunction hearing. The court is to err on the high side when setting the bond amount:

> Indeed, 'when setting the amount of security, district courts should err on the high side. If the district judge had set the bond at

> $50 million, as Abbott requested, this would not have entitled Abbott to that sum; Abbott still would have had to prove its loss, converting the 'soft' numbers to hard ones. An error in setting the bond too high thus is not serious. (The fee for a solvent firm such as Mead Johnson or its parent Bristol–Myers Squibb Co. to post a bond, a standby letter of credit, or equivalent security is a very small fraction of the sum involved.) . . . [A]n error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond.'

Habitat Education Ctr. v. United States Forest Serv., 607 F.3d 453, 456 (7th Cir. 2010) (*quoting* Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000)).

But the court can't just pull a figure out of the air. This order sets a shortened briefing schedule for the parties to address the issue of bond. The briefing schedule would be shortened even further had the court's consideration of the injunction motion not taken briefing into the holiday season.

III. CONCLUSION

The court GRANTS the motion of Galaxy Associates, Inc. for preliminary injunction [docket # 12]. The parties are given to and including December 27, 2012 within which to file memoranda and supporting documents concerning the amount of the bond, and then are given to January 4, 2013 within which to file responses to the initial memoranda. No replies shall be allowed. The movant shall submit its proposed injunction order by December 27.

SO ORDERED.

ENTERED: ___December 13, 2012___


   ___/s/ Robert L. Miller, Jr._____
Judge, United States District Court